# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00274-CV

---

**J. M., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-FM-19-008196, THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

J.M. (Mother) appeals from the trial court's final decree of termination.[1] Following a bench trial, the trial court terminated Mother's parental rights to her child, N.M. (Child), and appointed the Texas Department of Family and Protective Services as Child's permanent managing conservator. In five issues, Mother challenges the legal sufficiency of the evidence to support the trial court's predicate ground findings for termination, *see* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions or surroundings), (E) (endangering conduct), (O) (failing to comply with court-ordered services), and its findings to support termination under section 161.003, *see id.* § 161.003 (mental or emotional illness or mental deficiency rendering parent unable to provide for child's needs). Mother also challenges the factual sufficiency of the

---

[1] We refer to J.M. and her child by their initials or as Mother and Child. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. We also refer to another one of Mother's children by that child's initials. Child's father's parental rights also were terminated in the trial court's decree, but he is not a party to this appeal.

evidence to support the trial court's finding that termination of her parental rights was in Child's best interest. *See id.* §§ 161.001(b)(2), .003(a)(5). For the following reasons, we affirm the trial court's decree of termination.

## BACKGROUND

In November 2019, the Department placed one-month-old Child with his maternal grandmother (Grandmother) under a family safety placement after Mother was arrested at a bus station and Father stated that he was unable to care for Child by himself and asked for other arrangements to be made. Around a month later, the Department filed an original petition in a suit affecting the parent-child relationship, seeking to terminate parental rights and to be appointed managing conservator of Child.

In the Department's supporting affidavit to its petition, the Department's investigator averred about the November incident that resulted in Child's placement with Grandmother. The investigator averred that she had given Mother and Child a ride to the bus station, that Mother went to the restroom, and that the investigator then "heard screaming and a banging noise coming from the restrooms" and "ran in to see what was going on." She found Mother and Child in a locked bathroom stall with Mother "yelling, screaming, kicking the stall door, and hitting her body against the wall." The police and EMS were called. After the investigator was able to remove the child from Mother and EMS was "able to get [Mother] calm enough to evaluate her," the police arrested Mother on an outstanding assault warrant out of Dallas, and the Department placed Child with Grandmother.

The investigator also averred that the Department was requesting to be named temporary managing conservator of Child and for Child to remain with Grandmother because of

2

"significant concerns regarding [Mother's] mental health, her history with the Department, and her pattern of instability." The investigator averred that in October 2019, the Department received a referral that Mother "was hospitalized for pregnancy and mental health concerns prior to delivery"; that Mother's "mental health deteriorated during the investigation"; and that during her pregnancy with Child, Mother "had suicidal ideation and a suicide attempt," used marijuana, "had excessive alcohol consumption," and "had a mental break after drinking a lot of alcohol and smoking marijuana." The investigator also averred that the parents were currently homeless, sleeping in their car, and unable to take care of Child.

The trial court entered temporary orders that continued Child's placement with Grandmother and appointed the Department as the temporary managing conservator. The court also ordered Mother to complete specified tasks, including to complete a psychological evaluation, follow all recommendations, and submit to random drug testing as requested by the Department. Based on a mediated settlement agreement in November 2020, the case was extended for six months prior to its dismissal date, and Mother agreed to comply with specified services and conditions, including participating in drug and alcohol testing, attending and actively participating in individual therapy, and obtaining and maintaining safe and stable housing.

The bench trial occurred in June 2021. The witnesses included Department caseworkers, an outpatient adult psychiatrist, a psychological counselor, a licensed chemical dependency counselor, Mother, and Grandmother. The evidence showed that Mother had an extensive history with the Department and ongoing mental health issues. At the time of trial, one of Mother's children was living with that child's father, and Grandmother was taking care of Mother's four other children—Child, E.M., and her children who were five and thirteen.

Mother's parental rights to E.M. were terminated in April 2021 in a separate case in a different county. The evidence showed that E.M. was born in August 2020 and placed with Grandmother when he was two days old. The caseworker in E.M.'s case testified that the Department received an intake for neglectful supervision concerning E.M.; that Mother admitted, and testing confirmed, that she "was consuming alcohol and under the influence of marijuana during the pregnancy"; and that the Department was concerned with Mother's "mental health stability" and lack of participation in services.

The caseworker assigned to Child testified about the intake for neglectful supervision and mental health concerns with Mother when she was pregnant with Child, including her attempted suicide and "excessive alcohol consumption" during pregnancy, and the November 2019 incident at the bus station that resulted in Mother being arrested on an outstanding warrant and Child being placed with Grandmother. In the caseworker's opinion, it was in Child's best interest for Mother's parental rights to be terminated because "none of the [Department's] concerns were alleviated" and she had "concerns about [Mother's] erratic behavior." The caseworker also testified that Mother tested positive for marijuana once and did not comply with court-ordered services, including being unsuccessfully discharged from therapy four times, only participating in eight of forty-nine drug tests, and not drug testing after October 2020, but that Mother provided the Department with "some documents showing that she was turned away [from drug testing] because of her COVID symptoms" around October 2020 and "as recent as June 9th."

As to Child's current placement with Grandmother, the caseworker did not have concerns and believed that if Grandmother adopted Child, she would allow Mother to have access to Child if Mother was mentally stable and safe. Grandmother similarly testified that she

4

would allow Mother to have access to Child if Mother was mentally stable and safe and that she was comfortable deciding Mother's contact with Child. Grandmother hoped to adopt Child and believed that Mother could obtain stable housing and mental health treatment and be clear of drugs and drinking but "she hasn't been doing it so far." Grandmother testified that Mother "needs help" with her mental health and explained the difference between when "she's okay" and when "she's on a hiatus and stuff," "just talk[ing] out of her head," calling Grandmother "all times of the day and night and goes off," and forgetting about her children "when she's not doing too well." Grandmother also testified that Child was a "happy baby," bonded with his siblings, and about his "normal routine" at her home but that "[h]e don't know his mom." She explained that Mother "missed 12 straight visits, 12 weeks."

The counselors and therapist testified about their respective concerns with Mother's mental health. The psychological counselor testified that she saw Mother for about eight months starting in May 2020 and diagnosed her with a provisional diagnosis of disorganized schizophrenia. The counselor was concerned about Mother's ability to "perceive her reality accurately," expressing worry that "she would be reactive to [an] inaccurately perceived situation to the point where it could be dangerous to herself or a child." The counselor further testified that Mother disengaged, eventually disappeared, and was unsuccessfully discharged from therapy for lack of attendance and that she and Mother were "not able to reach a stabilization point because of the mental health issues and the lack of commitment to therapy."

The licensed chemical dependency counselor testified that she attempted to perform an evaluation for alcohol and drug screening in February 2021 but was unable to complete it because Mother "had a difficult time staying on task," "talked excessively," and "started talking over [the counselor]" such that they "were no longer communicating." The

5

counselor testified that Mother "seemed to be under the influence or maybe having some type of mental disconnect at the moment."

The outpatient adult psychiatrist testified that based on her evaluation of Mother in April 2021 and the history that was provided, she diagnosed Mother with schizophrenia with multiple episodes and a currently acute episode. She testified that Mother had symptoms of schizophrenia at the time of the evaluation, that the primary treatment is antipsychotic medication "to stabilize active symptoms," and that she was concerned about Mother using drugs or alcohol with a schizophrenia diagnosis and Mother's ability to parent based on her presentation during the evaluation when she was not on medication. The exhibits admitted at trial included the psychiatrist's written evaluation. In the summary section, the psychiatrist stated that Mother "had demonstrated mental and behavioral instability since approximately 2012 with a pattern of impaired judgment as indicated by the use of drugs and alcohol during her pregnancies despite CPS involvement"; that she "demonstrates paranoid delusions and disorganized speech and endorses the presence of auditory hallucinations, consistent with a diagnosis of schizophrenia"; that "[s]he has not followed up with her mental health provider and is not currently taking medication"; and that she "does not seem to be functioning well independently and does not have stable housing in a safe environment that would be appropriate for her children."

Mother testified that Grandmother "has schizophrenia too" but also denied that she ever "had mental health issues." She testified that she had a doctor at MHMR that had treated her and that she was not prescribed medicine for a schizophrenia diagnosis but for

anxiety. She denied that she hallucinates, made certain concerning statements,[2] or currently was using drugs or alcohol, but she admitted that she had used marijuana and cocaine in 2017, had three mental breakdowns including one in 2017, and had used ecstasy and marijuana when she was pregnant with Child. She also testified that she was not employed but got an apartment "today," that she was discharged from therapy because she lost her phone, that she was willing to go to therapy and take medicine to stabilize her anxiety, and that she did not drug test because of "COVID symptoms." She also recounted the November 2019 incident at the bus station, denying that she was "banging" her head but admitting that she "was very hysterical" and "just broke down crying." She testified that the only reason the Department was involved was because of her outstanding warrant for "simple assault" arising from a fight at a shelter.

Following the bench trial, the trial court entered its final decree of termination. The trial court found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of Child, *see* Tex. Fam. Code §§ 161.001(b)(2), .003(a)(5), statutory grounds existed for termination of the parent-child relationship, *see id.* § 161.001(b)(1)(D), (E), (O), and Mother had a mental or emotional illness or a mental deficiency that rendered her unable to provide for the needs of Child, *see id.* § 161.003. The trial court appointed the Department as Child's permanent managing conservator and subsequently entered findings of fact and conclusions of law. This appeal followed.

**ANALYSIS**

Mother's five issues challenge the trial court findings under sections 161.001 and 161.003. We begin with her issues challenging the trial court's findings under section 161.001.

_____

[2] The caseworker from E.M.'s case testified that Mother made concerning statements about her children being cloned and sex trafficked.

7

**Section 161.001**

In her first three issues, Mother argues that the evidence is legally insufficient to support the termination of her parental rights under subsections (D), (E), and (O) of section 161.001(b) and in her fifth issue, that the evidence is factually insufficient to support that termination of her parental rights is in Child's best interest.

*Standard of Review*

To terminate parental rights under section 161.001, the Department has the burden to prove one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is clear and convincing evidence. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). The clear and convincing evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"). Although "parental rights are of constitutional magnitude," "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a

firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

*Predicate Grounds*

In her first three issues, Mother challenges the legal sufficiency of the evidence to support the trial court's predicate-ground findings, but we limit our review to Mother's challenge to the legal sufficiency of the evidence to support the trial court's findings under subsections (D) and (E)—that (i) Mother knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being, and (ii) Mother engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis for appeal challenging subsection (D) or (E) findings).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be

9

directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* at *14. "Moreover, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted).

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *Id.* "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* at *10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Because the evidence pertaining to subsections (D) and

10

(E) is interrelated, we consolidate our review of the evidence. *See id.* at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

Mother argues that the evidence was legally insufficient to support termination under subsections (D) and (E) "because the Department did not give adequate help with obtaining drug testing." Mother focuses on the evidence that showed a "long laundry-list" of attempted or completed services and her inability to drug test because of her "COVID symptoms" and the lack of evidence that she was provided any alternative method of drug testing to argue that "[i]n the context of not being able to do all of her services, a termination ground that may have existed at the beginning of the case should not be the reason for termination" and "[b]ecause there was so much apparent effort on the part of [Mother], her parental rights should not have been terminated." She further argues that even if she were testing positive for drugs, that would not be enough to support termination on endangerment grounds.

But even without considering the missed drug tests during the pendency of the case, other evidence supports the trial court's endangerment findings including the evidence about Mother's attempted suicide and excessive alcohol and drug use while she was pregnant with Child and her drug use while she was pregnant with E.M. *See In re E.V.V.M.-H.*, No. 01-18-00888-CV, 2019 Tex. App. LEXIS 2473, at *14 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.) (explaining that "mother's knowing use of drugs during pregnancy constitutes a conscious course of conduct that endangers a child's physical and emotional well-being" and that "parent's suicide attempt also may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being"); *W.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00581-CV, 2015 Tex. App. LEXIS 1063, at *10 (Tex. App.—Austin Feb. 5, 2015, no pet.) (mem. op.) ("Drug abuse during

11

pregnancy constitutes conduct that endangers a child's physical and emotional well-being." (quoting *In re M.R.J.M.*, 280 S.W.3d at 502–03)); *A.H. & J.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00556-CV, 2012 Tex. App. LEXIS 4022, at *23–24 (Tex. App.—Austin May 18, 2012, no pet.) (mem. op.) (noting that mother's attempt to commit suicide while pregnant was evidence that mother engaged in conduct that endangered children's well-being); *see also M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 Tex. App. LEXIS 3310, at *25 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.) (explaining that drug use may support termination under subsection (E) "because it exposes the child to the possibility that the parent may be impaired or imprisoned"). In addition to the caseworker's testimony, Grandmother testified that Mother "so far" had been unable to be clear of drugs and drinking, Mother admitted to using marijuana and ecstasy when she was pregnant with Child, and the caseworker in E.M.'s case testified that Mother had consumed marijuana when she was pregnant with E.M., which was during the pendency of this case. *See S.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00142-CV, 2021 Tex. App. LEXIS 6392, at *12 n.3 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.) (recognizing that parent's decision to use illegal drugs during pendency of termination proceeding, when parent is at risk of losing child, may support endangerment finding).

In reaching its endangerment findings, the trial court also could have credited the evidence about the November 2019 incident at the bus station in which Mother had Child in a locked bathroom stall and was throwing herself against the wall of the bathroom stall. *See V.P.*, 2020 Tex. App. LEXIS 938, at *9–10 (explaining that under subsection (D), inappropriate or abusive conduct by person who lives in child's home "is part of the 'conditions or surroundings' of the child's home"). Mother also had an outstanding warrant for assault that resulted in her

12

arrest and the Department having to find a placement for Child. *See M.D.*, 2021 Tex. App. LEXIS 3310, at \*25 ("[E]vidence of a parent's criminal history, convictions, and resulting imprisonment may establish an endangering course of conduct."); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child." (citation omitted)). Prior to and during the entirety of the case, the evidence also showed that Mother was mentally unstable and not taking medication to reach a stabilization point. *See In re F.M.E.A.F.*, 572 S.W.3d 716, 737 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (considering evidence that mother was mentally unstable when she did not take medication and that she had not been taking medication among evidence that was sufficient to support endangerment ground); *see also In re M.E.-M.N.*, 342 S.W.3d at 262 (explaining that parent's mental state may be considered in endangerment determination).

Viewing the evidence under the applicable standard of review, even without considering the evidence of missed drug testing during the pendency of the case, we conclude that the evidence was legally sufficient to support the trial court's findings under subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232–33, 237; *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule Mother's first and second issues and do not reach her third issue addressing subsection (O). *See In re N.G.*, 577 S.W.3d at 232–33.

13

*Best Interest*

In her fifth issue, Mother challenges the factual sufficiency of the evidence to support that termination of her parental rights was in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23.

Mother argues that the evidence was "not clear" whether "she has achieved sobriety and is mentally ill, or she is experiencing the effects of substance abuse, which could be temporary" and that "in the absence of regular drug testing," the evidence that tended to show she "was not experiencing drug related psychosis" was not compelling. Mother also argues that "because there was a family member who was available for placement, a conservatorship

14

agreement with the placement was a possibility" and she "could have a shared parenting plan with the placement." The evidence, however, showed that Mother was not stable or able to safely care for Child during the pendency of the case or at the time of trial. *See Holly*, 544 S.W.2d at 371–72 (including parental abilities and stability of home and proposed placement as factors to consider in best interest determination).

The psychiatrist and psychological counselor testified about Mother's mental illness diagnosis and their concerns with her caring for a child without treatment. The counselor who started seeing Mother in 2020 was concerned about Mother's mental health and ability to perceive reality accurately "where it could be dangerous to herself or a child" and explained that prior to Mother's discharge from therapy for lack of attendance, they were unable to reach a "stabilization point because of the mental health issues and the lack of commitment to therapy." The psychiatrist testified that Mother had symptoms of schizophrenia at the time of her April 2021 evaluation, the primary treatment was antipsychotic medication, and she was concerned about Mother's ability to parent based on her presentation during the evaluation when she was not on medication. In the summary section of the psychiatrist's written evaluation, the psychiatrist's conclusions included that Mother had not followed up with her mental health provider, was not taking medication, did not seem to be functioning well independently, and did not have stable housing in a safe environment that would be appropriate for her children.

Although Grandmother testified that Mother could obtain stable housing and mental health treatment and Mother testified that she got an apartment "today," had a doctor at MHMR, and was willing to take medicine for anxiety and go to therapy, Grandmother testified that Mother "needs help" with her mental health and explained the difference between when "she's okay" and when "she's on a hiatus and stuff," "just talk[ing] out of her head," calling

15

Grandmother "all times of the day and night and goes off," and forgetting about her children. Grandmother also testified that Child was a "happy baby" who was bonded with his siblings and that he did not know Mother, explaining that Mother "missed 12 straight visits, 12 weeks." *See id.* (including child's needs now and in future and parent's acts and omissions showing that the parent-child relationship was not proper as factors to consider in best interest determination). Grandmother further testified that if she adopted Child, she would allow Mother to have contact with Child if appropriate.

Viewing the evidence under the factual sufficiency standard of review, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of Child. *See In re A.C.*, 560 S.W.3d at 631. Thus, we conclude that the evidence was factually sufficient to support the trial court's best interest finding. We overrule Mother's fifth issue.

**Section 161.003**

In her fourth issue, Mother argues that the evidence is legally insufficient to support termination of her parental rights under section 161.003 because she "was not given accommodations for having coronavirus symptoms which prevented drug testing." *See* Tex. Fam. Code § 161.003 (authorizing termination of parent-child relationship based on finding of parent's mental or emotional illness or mental deficiency rendering parent unable to provide for child's needs). Given our conclusion that the evidence was sufficient to support termination of Mother's parental rights under section 161.001, we need not address this issue that challenges an alternative statutory ground for terminating her rights. *See In re A.V.*, 113 S.W.3d at 362; *In re K.B.*, No. 02-09-00441-CV, 2010 Tex. App. LEXIS 8301, at *35 n.16 (Tex. App.—Fort Worth

16

Oct. 14, 2010, no pet.) (mem. op.) ("Texas law provides that parental rights may properly be terminated when a trial court has made a finding under either section 161.001(1) or section 161.003, plus a best interest finding under section 161.001(2)."); *In re W.E.C.*, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.) (explaining that appellate court need not address appellant's points concerning findings under section 161.003(a) when court concluded that evidence was sufficient under section 161.001).

## CONCLUSION

For these reasons, we affirm the trial court's final decree of termination.


_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed: November 10, 2021